AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Southern District of Texas

United States Courts
Southern District of Texas
FILED
*July 31, 2025*
Nathan Ochsner, Clerk of Court

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Cameron Jake TUCKER | ) | Case No. |
| | ) | **4:25-mj-460** |
| Defendant(s) | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **May 14, 2025** in the county of **Harris** in the **Southern** District of **Texas**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1201 | Kidnapping |
| 18 U.S.C. § 1203 | Hostage Taking |
| 18 U.S.C. § 922(g)(1) | Possession of a Firearm by a Prohibited Person |
| 8 U.S.C. § 1324(a)(1)(A)(iii) | Harboring Aliens |
| 8 U.S.C. § 1324(a)(1)(A)(v) | Conspiracy to Harbor Aliens |

This criminal complaint is based on these facts:

Please see the Affidavit on the attached sheet.

☑ Continued on the attached sheet.

*Complainant's signature*

David Rosenau, Special Agent
*Printed name and title*

Submitted by reliable electronic means, sworn to, and signature attested to telephonically pursuant to Fed. R. Crim.P.4.1., on

Date: 07/31/2025

*Judge's signature*

City and state: Houston, Texas

Hon. Richard W. Bennett, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF ARREST WARRANT

1. I, David Rosenau, am employed as a special agent (SA) with United States Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I am currently assigned to the Homeland Security Task Force (HSTF) in Houston, Texas. I am empowered by the DHS as an SA to execute arrests, searches, and seizures for violations of Titles 8, 18, 19, 21, and 31 of the U.S. Code and related offenses. I have been an SA for HSI since March of 2021. Previously, from March of 2012 to June of 2020, I was employed with U.S. Customs and Border Protection (CBP) as a CBP Officer and was assigned to the Brownsville (Texas) Port of Entry. My primary duties included admissibility inspections and law enforcement functions relating to the identification, interdiction, investigation, arrest, and prosecution of criminal violators, as well as the detention and deportation of aliens. Prior to my employment as a CBP Officer, I was employed from July of 2010 to March of 2012 with the Marshall (Texas) Police Department as a police officer. My primary duties were to patrol and interdict criminal activities, conduct preliminary criminal and traffic investigations, and respond to various calls for service within the community. Throughout my law enforcement career, I have conducted and received training in numerous types of investigations related to alien smuggling, drug smuggling, human trafficking, child exploitation, and money laundering.

2. The information set forth in this Affidavit is based upon Affiant's personal knowledge and/or information provided to Affiant by other law enforcement officers, criminal investigators, and other individuals the undersigned believes to be reliable and credible.

3. Because this Affidavit is being submitted for the limited purpose of supporting a criminal complaint, Affiant has not included each and every fact concerning this investigation. Affiant has set forth only the facts believed to establish probable cause that Cameron Jake **TUCKER** has committed violations of federal law.

4. On May 14, 2025, HSI SAs responded to a residence located at 9303 Kingsflower Circle in Houston, Texas in reference to possible ongoing human trafficking or smuggling event, as reported by the Houston (Texas) Police Department (HPD). Upon arrival, HSI SAs met with HPD patrol officers and detectives and learned that the complainant, hereinafter referred to as "F.J.J.," had escaped what officers believed to be a residence that was actively being utilized as an alien stash house. Additionally, HPD detectives informed SAs that HPD currently had one male individual, later identified as Cameron Jake **TUCKER** and hereinafter referred to as "**TUCKER**," in police custody after he had fled from the suspected alien stash house and evaded HPD officers. SAs also learned that HPD detectives were awaiting state search warrant authorization for the residence as part of the ongoing investigation. Subsequently, SAs waited with detectives and assisted with securing the scene and safeguarding potential evidence at the residence. During that time, HPD detectives explained the initial reporting and encounter with F.J.J. to HSI SAs.

5. On the same day, Affiant spoke with Detective D. Steigerwald, a certified peace officer in the State of Texas, a credible and reliable person employed as a police officer with the HPD, and learned that a 911 emergency call was received on May 14, 2025 regarding a possible robbery that had just occurred. HPD patrol officers responded to an area located at 9499 Blackhawk Boulevard, near a 7-Eleven convenience store, where they were subsequently flagged down by F.J.J. There, F.J.J. told HPD officers that he had been forced to stay in an upstairs bedroom closet of a residence located at 9303 Kingsflower Circle. F.J.J. told officers that he had been at the residence for approximately two or three days and was given food on the first two days but was denied food on the third day. F.J.J. said that he was given water all three days. F.J.J. explained that **TUCKER** and another male individual, later identified as Robert Lawrence GARCIA and hereinafter referred to as "GARCIA," were in contact with his family in Mexico and were requesting a ransom of 40,000 Mexican pesos, which the family eventually paid to **TUCKER** and GARCIA. F.J.J. explained to HPD officers that **TUCKER** and GARCIA used their own phones to

communicate with his family in Mexico. F.J.J. further explained that, on the morning of May 14, 2025, he was in the bedroom and did not hear anyone at the house so he moved a mattress that was blocking the bedroom door and peaked out the door. F.J.J. told officers that he did not hear anyone, so he then escaped out of the top bedroom window and ran to get help. This is when he was able to soon encounter HPD officers.

6. Following the encounter with F.J.J., HPD officers drove with F.J.J. back to the residence located at 9303 Kingsflower Circle where F.J.J. had been held in a bedroom closet. The officers notified additional patrol officers to set up a perimeter around the house. The officers then approached the front door of the residence and heard some "banging" noise coming from inside the residence. Officers also observed numerous surveillance cameras on the exterior of the house pointed at the exit doors. The officers knew from F.J.J. that there had been additional people being held in one of the first alien stash houses that F.J.J. had been kept at earlier in his journey and prior to arriving in Houston and that, regarding 9303 Kingsflower Circle, F.J.J. was unsure if there were any additional people that could have been held there. The officer, being concerned for possible additional victims inside the residence, then breached the front door. While officers were breaching the front door, officers located **TUCKER** in some high grass outside the residence. **TUCKER** was escorted back to the scene so that F.J.J. could see him and verify that **TUCKER** was the same individual that he had just escaped from. Upon observing **TUCKER**, F.J.J. confirmed to the officers that **TUCKER** had been one of the individuals holding him against his will at the residence. Notably, at the time of arrest, **TUCKER** had possession of vehicle keys belonging to a white 2018 Chrysler four-door passenger car bearing Texas license plate number VZW1692 ("TX LP VZW1692") that was parked in the garage of the residence located at 9303 Kingsflower Circle.

7. At approximately 9:00 AM, HSI SAs arrived at 9303 Kingsflower Circle after **TUCKER** had already been arrested and identified. HPD detectives informed SAs that the other stash house caretaker (GARCIA) was still outstanding and had not yet

been located.

8. At approximately 1:22 PM, upon receiving notification that the search warrant had been signed, HPD detectives and HSI SAs initiated a search of the residence. During the search, detectives and SAs discovered a dark-colored Smith and Wesson, Model 36, .38 S&W SPL revolver pistol, bearing serial number ANB2806 stored inside a shoe box. The shoe box was located in an upstairs bedroom adjacent to the bedroom that F.J.J. had previously described and identified to HPD officers as the exact bedroom that contained the closet that he had been forced into. Further, according to HPD officers, three (3) additional handguns were also discovered inside the residence: Smith and Wesson, Model SW40VE, .40 pistol, bearing serial number DUS1859, a Smith and Wesson, Model MP 9 Shield, 9mm pistol, bearing serial number JCT4017, and a Taurus Model G3, 9mm pistol, bearing serial number ACA411534.

9. Additionally, following the search of the residence, HSI SA M. Lundquist informed Affiant that he had located a folded piece of paper that was situated on a nightstand next to the bed in one of the upstairs bedrooms. Upon closer inspection, the piece of paper appeared to be an appointment reminder letter dated May 9, 2025 and mailed from the Walker County (Texas) Community Supervision and Corrections Department. The letter was addressed to GARCIA and referenced GARCIA's address as 327 Tennyson Street in San Leon, Texas. Following the completion of the search, no other individuals were located in or near the residence, and GARCIA was still missing.

10. HSI SAs then conducted queries in law enforcement databases for GARCIA which resulted in positive results for criminal history. Notably, GARCIA had been arrested in Huntsville, Texas, a city within Walker County, by the Huntsville Police Department on August 2, 2023. HSI SAs then obtained a mugshot from one of GARCIA's previous arrests and used it to create a photograph array, commonly referred to as a "six-pack photograph lineup," in preparation for an interview with F.J.J.

11. On the same day, at approximately 6:15 PM, Affiant and HSI SA E. Marrero conducted an audio-recorded interview of F.J.J. at the HSI Houston main office. During the interview, F.J.J. told SAs that he began his journey from his home in Villahermosa, Tabasco, Mexico on approximately May 1st or 2nd of 2025 and intended to travel to the U.S. F.J.J. then explained to SAs the financial arrangements made with the human smuggling organization that was coordinating and facilitating his transportation from Mexico to the United States. F.J.J. and/or his family was supposed to pay a total of approximately ten thousand U.S. dollars ($10,000). The final destination was supposed to be a location in Missouri to be with family. F.J.J. told SAs he did not know or remember the city or area of Missouri his family lived in. F.J.J. further told SAs that he was supposed to pay two thousand dollars ($2,000) upon his arrival to the Mexico/U.S. border, and then pay an additional portion upon arriving in Houston, and lastly pay a final portion after arriving at his final destination. F.J.J. told SAs that he had already paid $2,000 and that his family may have already paid an additional amount, but that he was unsure.

12. Additionally, F.J.J. told SAs that, upon arriving at the residence located at 9303 Kingsflower Circle, **TUCKER** and GARCIA confiscated F.J.J.' cellular phone and did not allow him to use it without **TUCKER** and/or GARCIA present. On the third day of staying at the residence, **TUCKER** called an unknown individual to translate back and forth from the Spanish and English languages so that they could communicate with F.J.J. During this last call, **TUCKER** directed the unknown person over the phone to translate and demand F.J.J. to pay additional money. F.J.J. told SAs that he told the unknown individual that his family had paid all that they could for now and did not have any additional money to pay.

13. F.J.J. explained that, shortly after the translated phone call and demand for additional money, **TUCKER** became angry and ultimately assaulted F.J.J. Specifically, **TUCKER** pointed a revolver handgun at F.J.J. and touched the barrel of the revolver to F.J.J.'s head while simultaneously **TUCKER** punched F.J.J.'s head multiple times with a free hand. F.J.J. stated to SAs he was scared when this happened, and he

thought he was going to die. Additionally, according to F.J.J., **TUCKER** was yelling in the English language and appeared to be very angry during this time, but F.J.J., a Mexican citizen and native Spanish-speaker, did not understand what **TUCKER** was saying other than commands for him (F.J.J.) to enter the bedroom closet. F.J.J. also told agents that he believed that the revolver was black in color. Additionally, F.J.J. explained to SAs that GARCIA was also in the same room during this time and that he (GARCIA) observed **TUCKER**'s actions but was not actively involved in the physical assault of F.J.J. F.J.J. told SAs that he then entered the closet where he understood he had to remain until he was told that he was free to leave and/or his family sent additional money.

14. F.J.J. told SAs that, at some point in the middle of the night, he believed that either **TUCKER** or GARCIA or both had left the residence. F.J.J. believed that this was his chance to escape. Ultimately, F.J.J. left the closet, opened the bedroom window, and jumped from the second floor to the ground, injuring his foot. F.J.J. ran away from the residence and encountered a nearby construction site security officer on a nearby street where he was able to ask for help, leading to the initial 911 call.

15. As the interview continued, at approximately 7:10 PM, Affiant and HSI SA Marrero presented a six-pack photograph lineup to F.J.J. The lineup contained one photograph of GARCIA. Immediately, F.J.J. indicated he recognized GARCIA by pointing his finger at the corresponding photograph. F.J.J. then confirmed to agents that the person in the photograph was one of the caretakers from the residence who was working alongside **TUCKER** and was present when F.J.J. was assaulted. F.J.J. confirmed that GARCIA was also the same person who picked him up at an unknown location north or east of a U.S. Border Patrol immigration checkpoint near Eagle Pass, Texas and drove F.J.J. to the current residence located at 9303 Kingsflower Circle in the same white Chrysler four-door passenger car (TX LP VZW1692) that had been discovered by law enforcement still parked in the garage of the house.

16. Following the completion of the interview, HSI SAs conducted queries in law

enforcement databases for **TUCKER** which resulted in positive results for criminal history. Specifically, **TUCKER** had been previously convicted of state violations of Title 6, Texas Health and Safety Code, Section 481.112, "Manufacture or Delivery of a Controlled Substance in Penalty Group 1," as well as Title 8, Texas Penal Code, Section 38.04, "Evading Arrest or Detention with Vehicle." HSI SAs knew that these criminal convictions likely meant that **TUCKER** was a "prohibited person" as defined by Title 18 U.S.C. 922(g)(1) and was not allowed to be in possession of a firearm.

17. On the same day, **TUCKER** was arrested by HPD for violations of Title 5, Texas Penal Code, Section 20.04, "Aggravated Kidnapping," and transported to the Harris County Joint Processing Center. Whereas, F.J.J. was arrested by HSI SAs for administrative, non-criminal immigration violations and transported to a U.S. Immigration and Customs Enforcement (ICE) detention facility to be held as a Material Witness pending appearance before an Immigration Judge (IJ).

18. On July 18, 2025, after physically reviewing the firearms that were seized during the execution of the state search warrant at 9303 Kingsflower Circle, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) SA R. Frese provided Affiant with an initial firearm nexus analysis. Specifically, SA Frese states he knows through his training and experience that Smith and Wesson, Model SW40VE, .40 pistols are manufactured in Tennessee and Massachusetts, and not in the State of Texas. Therefore, the Smith and Wesson, Model SW40VE, .40 pistol, serial #DUS1859 has traveled in interstate commerce. SA Frese knows through his training and experience that Smith and Wesson, Model 36, .38 S&W SPL revolver pistols are manufactured in Tennessee and Massachusetts, and not in the State of Texas. Therefore, the Smith and Wesson, Model 36, .38 S&W SPL revolver pistol, serial #ANB2806 has traveled in interstate commerce. SA Frese knows through his training and experience that Smith and Wesson, Model MP 9 Shield, 9mm pistols are manufactured in Tennessee and Massachusetts, and not in the State of Texas. Therefore, the Smith and Wesson, Model MP 9 Shield, 9mm pistol, serial #JCT4017 has traveled in interstate commerce. SA Frese also knows that Taurus does not have a manufacturing facility

in the state of Texas. Therefore, the Taurus Model G3, 9mm pistol, bearing serial #ACA411534, traveled in interstate commerce.

19. Based on the forgoing information, Affiant has reason to believe and does believe that, on or about May 14, 2025, Cameron Jake **TUCKER** committed violations of Title 18 U.S.C. 1201, "Kidnapping," Title 18 U.S.C. 1203, "Hostage Taking," Title 18 U.S.C. 922(g)(1), "Possession of a Firearm by a Prohibited Person," Title 8 1324(a)(1)(A)(iii), "Harboring Aliens," and Title 8 U.S.C. 1324(a)(1)(A)(v), "Conspiracy to Harbor Aliens."

David Rosenau
Special Agent
Homeland Security Investigations

Submitted by reliable electronic means, sworn to, signature attested telephonically per Fed.R.Crim.P.4.1, and probable cause found on the 31st day of July 2025.

**Hon. Richard W. Bennett**
**United States Magistrate Judge**
**Southern District of Texas**